# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | | |
|---|---|---|
| **SIGISFREDO TORRES,** | ‖ | |
| Plaintiff, | ‖ | **No. 11-CV-4051-DEO** |
| v. | ‖ | **ORDER** |
| **QUATRO COMPOSITES, L.L.C., A Division of Tec Industries,** | ‖ | |
| Defendant. | ‖ | |

---

## I. INTRODUCTION

On May 27, 2011, Sigisfredo Torres, Plaintiff, filed a Complaint with this Court against Quatro Composites, Defendant. The Complaint consists of five counts: (1) racially hostile work environment, (2) racial discrimination, (3) sexually hostile work environment, (4) retaliation based on Plaintiff's race and sex, and (5) related violations of the Iowa Civil Rights Act. Docket No. 1. Currently before this Court is Defendant's Motion for Summary Judgement as to all counts. Docket No. 10-1.

## II. FACTS

Defendant "engineers and manufactures advanced composite products for the aerospace, military, and medical industries."

Docket No. 10-2, 1 and Docket No. 13-1, 1.  Plaintiff worked at Defendant's plant in Orange City, Iowa.  <u>Id.</u>  Plaintiff had formerly worked at Defendant's plant in Poway, California, but requested a transfer to Orange City, Iowa, in March of 2006. <u>Id.</u>  In August of 2007, Plaintiff also requested the transfer of his mother, Luz Garcia, from the plant in Poway to Orange City.  <u>Id.</u>

Plaintiff alleges that in an Orange City plant meeting in which Plaintiff's transfer was discussed, Evelyn DeVos, Plaintiff's soon to be "team lead,"[1] asked whether Plaintiff spoke English.  Docket No. 15-4, 2.  Plaintiff also alleges that when his mother was being transferred from the Poway plant, Ms. DeVos told several people that "it should be mandatory for all employees to speak English . . . ."  Docket No. 15-4, 12.  Soon after Plaintiff started work, Plaintiff alleges Ms. DeVos began keeping tabs on his time clock and sharing the information she discovered with other employees.

---

[1] At Defendant's plant, team leads organized the work for their departments, assigned people to work projects, directed them in the completion of their work, set the number of hours they worked, and evaluated their work performance.  Docket No. 15-4.  Team leads did not have the "authority to hire, fire, promote, or reassign employees to a different department." Docket No. 10-2, 2 and Docket No. 13-1, 3.

Docket No. 15-4, 4. She "would also watch [Plaintiff] while he was working, and would stand and stare at him if he was on the phone or if he was on break." Docket No. 15-4, 4. Ms. DeVos also began treating Plaintiff like he was stupid and told other employees to tell him to "fuck off" and call him an "asshole" and "dumb Mexican." Docket No. 15-4, 4 and Docket No. 10-3, 8.

At some point, Plaintiff's bottle of hot sauce was stolen "after repeated comments" about him using it on all his food. Docket No. 15-4, 3. He also contends co-workers "began putting derogatory notes on his lunch in the refrigerator in the lunch room." Docket No. 15-4, 3 and 6. In his deposition, Plaintiff testified that the notes were about "little things," like remembering to clock out. Docket No. 10-3, 9. Plaintiff did not indicate the notes consisted of racial or sexual content. Id. However, Plaintiff does allege that he was called "dumb Mexican" or "dumb ass" every other day. Docket No. 15-4, 6. Some of Plaintiff's co-workers, on a daily basis, also began making jokes about the supposedly small size of Mexican penises, as well as other sexually graphic comments. Docket No. 15-4, 6. Though the Plaintiff

admits he would occasionally laugh at the comments, he claims that he tried to avoid these conversations as much as possible. Docket No. 15-4, 6.

In addition, on a single occasion a co-worker stated that trailer trash was a step up from being a Mexican; and on another occasion, Plaintiff was asked to do a rain dance because he was the closest thing the company had to an Indian. Docket No. 15-4, 7.

According to Plaintiff, one of his co-workers also began calling him a border crosser. Docket No. 13-4, 6. Though Plaintiff admits that he laughed about it and told her the correct term was "border jumper," he thought that, at some point, the joke got "out of hand." Docket No. 13-4, 4. Plaintiff asked his co-worker to stop on a few occasions, but she refused. Docket No. 13-4, 4.

On July 19, 2007, Plaintiff's superiors, Mr. Heemstra and Ms. Ahlers, held meetings with Plaintiff and Ms. DeVos. Docket No. 15-4, 8. Plaintiff and Ms. DeVos signed an agreement to treat each other civilly. Docket No. 15-4, 8. Plaintiff contends he first formally complained that the agreement was violated in August of 2009, when he was

reprimanded by Ms. DeVos in front of his co-workers. Docket
No. 15-4, 8. There is no indication Ms. DeVos made any
racially or sexually derogatory comments while she reprimanded
Plaintiff; and Plaintiff admits that he had made a mistake in
his work but felt Ms. DeVos handled the situation
unprofessionally. Docket No. 15-4, 9. While Ms. Ahlers and
Mr. Heemstra did speak to Ms. DeVos about the situation, no
formal disciplinary action was taken against her. Docket No.
15-4, 10.

Overall, Plaintiff contends he continued to lodge
complaints from 2007 through his termination in 2009. Docket
No. 15-4. Plaintiff's wife, who also worked at Defendants'
Orange City plant, also filed complaints related to the
treatment of her husband. Docket No. 15-4, 7. Though several
complaints were lodged, Plaintiff contends his co-workers
continued to harass him, including nearly daily comments about
the size of Mexican penises, but were never formally punished.
Docket No. 15-4, 4, 12 and 13.

In April of 2009, Plaintiff contends he declined the
sexual advances of a fellow female employee who then, spurned
by Plaintiff's rebuke, made up rumors that Plaintiff was

having an affair with another female co-worker.  Docket No. 15-4, 13 and Docket No. 13-4, 12.  Though, after this incident, Plaintiff began to avoid contact with his co-workers, "other employees told him that [Ms.] DeVos continued to make derogatory comments" related to his race.  Docket No. 15-4, 13.

On November 24, 2009, Luz Garcia, Plaintiff's Mother, and Steve Gettner were working in adjoining work spaces.  Docket No. 10-2, 1 and Docket No. 13-1, 1.  Ms. Garcia did not feel she had enough work space and pushed some of Mr. Gettner's things sitting on a table they were sharing into a machine Mr. Gettner was using.  Docket No. 10-2, 1 and 13-1, 1.  According to the testimony of the Plaintiff, Mr. Gettner then grabbed boxes and shoved them at Ms. Garcia, hitting her in the stomach with them.  Docket No. 15-4, 13.  Plaintiff attempted to talk to his supervisors about what had happened but they were in a meeting.  Docket No. 15-4, 14 and Docket No. 10-2, 2.  Soon thereafter, Plaintiff ran into Mr. Gettner on the loading docks and, in his own words, "lost it."  Docket No. 10-2, 2.  Plaintiff came within a foot of Mr. Gettner and

aggressively told him that if he ever disrespected his mom again, Plaintiff would "kick his ass." Docket No. 13-4, 17.

Mr. Heemstra's notes indicated "Mr. Gettner was 'visibly shaken' when he reported the incident" to him. Docket No. 10-2, 2 (quoting Docket No. 10-3, 47 and 100). When confronted by the company President, Mr. Roesner, Plaintiff admitted that he had made a mistake but also explained the events leading up to his reaction. Docket No. 10-2, 2 and Docket No. 13-1, 2. Sometime after the incident between Mr. Gettner and Plaintiff, Plaintiff's mother was taken to the emergency room and treated for an anxiety attack. Docket No. 13-4, 79.

Ostensibly due to Plaintiff's altercation with Mr. Gettner, Defendant suspended Plaintiff; and Plaintiff was terminated a week later. Docket No. 10-2, 2 and Docket No. 13-1, 2. The Defendant did not take any disciplinary action against Mr. Gettner. Docket No. 13-2, 11. Plaintiff also notes a previous incident where a non-Hispanic employee threatened to kick another employee's ass in which the non-Hispanic employee was not terminated. Docket No. 13-3, 11.

The Defendant contends that Plaintiff often participated in the jokes shared between co-workers about Mexicans. For

instance, Plaintiff participated in joking about the number of people Mexicans can fit into a single car. Docket No. 10-2, 5. He also, at one point, shaped a piece of silicon into the shape of a penis upon a co-worker's request, though he knew the co-worker who made the request was going to put it into the locker of another female co-worker. Docket No. 10-2, 5 and 6. When the female co-worker got mad and reported the incident to supervisors, Plaintiff told her, "If you can't handle a joke, then you shouldn't be joking." Docket No. 10-2, 6. However, Plaintiff's overall testimony reflects that though he attempted to initially laugh off what he perceived as racial and sexual harassment, he, at some point, felt things began to cross a line. Docket No. 13-1, 5.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(c). A fact is *material* if it is necessary "to establish the existence of an element essential to [a] party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986). There is a *genuine issue* as to a material fact if, based on the record before the court, a "rational trier of fact" could find for the non-moving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When considering a motion for summary judgment, a "court must view the evidence in the light most favorable to the nonmoving party . . . ." <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771 (8th Cir. 1995). This requires a court to draw any reasonable inference from the underlying facts in favor of the nonmoving party and to refrain from weighing the evidence, making credibility determinations, or attempting to discern the truth of any factual issue in a manner which favors the moving party unless there is no reasonable alternative. <u>See Matsushita</u>, 475 U.S. at 587; and <u>Morris v. City of Chillicothe</u>, 512 F.3d 1013, 1018 (8th Cir. 2008) (citing <u>Thomas v. Corwin</u>, 483 F.3d 516, 526-27 (8th Cir. 2007)).

Procedurally, the movant bears the initial burden "of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395 (8th

Cir. 1992) (citing <u>Celotex</u>, 477 U.S. at 323). Once the movant has carried his burden, the non-moving party is required "to go beyond the pleadings" and through "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(e)).

## IV.  RETALIATION AND DISCRIMINATION CLAIMS:  THE <u>MCDONNELL DOUGLAS</u> BURDEN SHIFTING FRAMEWORK

Both the Civil Rights Act of 1964 (hereinafter "Title VII") and the Iowa Civil Rights Act of 1965 (hereinafter "ICRA") make it unlawful for an employer to discriminate against an employee based on race, color, religion, sex, or national origin, and "Iowa Courts . . . turn to federal law for guidance in evaluating ICRA."  42 U.S.C. § 2000e-2; Iowa Code §216.6;[2] and <u>Vivian v. Madison</u>, 601 N.W.2d 872, 873 (Iowa 1999).  Title VII and ICRA also prohibit retaliation against

---

[2] In addition to discrimination based on race, color, religion, sex, and national origin, the Iowa Civil Rights Act of 1965 also makes it unlawful for an employer to discriminate against an employee on the basis of age, creed, sexual orientation, gender identity, and disability.  Iowa Code § 216.6.

employees for opposing practices made unlawful within the respective Acts, and retaliation claims under ICRA are analyzed under the "same method as federal retaliation claims." <u>Young-Losee v. Graphic Packaging Intern., Inc.</u>, 631 F.3d 909, 911-12 (8th Cir. 2011) (citing 42 U.S.C. § 2000e-3(a)); <u>Smith v. Allen Health Systems, Inc.</u>, 302 F.3d 827, 836 (8th Cir. 2002) (citing <u>O'Bryan v. KTIV Television</u>, 64 F.3d 1188, 1193 fn. 5 (8th Cir. 1995)); <u>see also</u> Iowa Code 216.11(2).

A party may prove a discrimination or retaliation claim through either direct or indirect evidence. <u>Guimaraes v. SuperValu, Inc.</u>, 674 F.3d 962, 972 (8th Cir. 2012). Direct evidence "is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision,'" which, in this case, was Plaintiff's termination. <u>Id.</u> (quoting <u>Thomas v. First Nat'l Bank of Wynne</u>, 111 F.3d 64, 66 (8th Cir. 1997)). If there is direct evidence linking a defendant's alleged discrimination with an adverse employment decision, or there is direct evidence linking an adverse employment decision with a retaliatory motive, summary judgment is generally inappropriate. <u>Id.</u>

Both parties impliedly concede Plaintiff relies on indirect evidence. When a Plaintiff relies on indirect evidence, the 8th Circuit and Iowa Court's employ the burden shifting framework the Supreme Court announced in <u>McDonnell Douglas Corp. v. Green</u>. 411 U.S. 792 (1973). Under the <u>McDonnell Douglas</u> framework, a plaintiff "must first establish a prima facie case of discrimination" and/or retaliation. <u>Guimaraes</u>, 674 F.3d at 973 (citing <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1046 (8th Cir. 2011)).

Once a prima facie case is established, there is a rebuttable presumption of discrimination and/or retaliation. <u>Id.</u> at 973. "The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision." <u>Id.</u> If the defendant fails to provide such a reason for his decision, summary judgment is inappropriate. <u>Id.</u> If the defendant does provide "such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was a pretext for discrimination." <u>Id.</u>

Defendant makes one general argument against all of Plaintiff's retaliation and discrimination claims[3] and one specific argument in relation to Plaintiff's retaliation claims. In relation to all of Plaintiff's retaliation and discrimination claims, Defendant contends that it had a legitimate non-discriminatory reason for terminating Plaintiff. In relation to Plaintiff's retaliation claims, Defendant contends that Plaintiff has failed to establish a prima facie case of retaliation.

**A.  Whether Plaintiff has Established a Prima Facie Case of Retaliation?**

In order to establish a prima facie case in a retaliation claim, a plaintiff must "show (1) he engaged in protected conduct, (2) he suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct." Guimareas, 674 F.3d at 978. Defendant contends Plaintiff has failed to make a showing that his termination was causally linked to his complaints of discrimination.

---

[3] Throughout this Order this Court refers to Plaintiff's discrimination and retaliation claims, rather than claim, because Plaintiff has plead violations under both Title VII and ICRA.

To prove a causal link, a plaintiff "must demonstrate that defendant's 'retaliatory motive played a part in the adverse employment action.'" Thomas v. Corwin, 483 F.3d 516, 531 (8th Cir. 2007) (quoting Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 896-97 (8th Cir. 2002)). "Evidence giving rise to an inference of a retaliatory motive on the part of the employer is sufficient to establish the requisite causal link." Id.

The Defendant contends that Mr. Roessner, who made the ultimate decision to terminate Plaintiff, was unaware of the Plaintiff's complaints. Docket No. 13-3, 11. The Defendant also notes that Plaintiff admits that his supervisors, who provided input to Mr. Roessner prior to his decision, did not discriminate against Plaintiff. Docket No. 13-3, 12. The Plaintiff makes several counter-arguments, but it is unnecessary to consider each in detail because this Court ultimately finds in Plaintiff's favor.

Notably, the record establishes that despite allegedly repeated complaints from Plaintiff from 2007 up until the incident with Mr. Gettner, Defendant failed to take any formal disciplinary action against those who were allegedly

14

discriminating against Plaintiff.  Docket No. 15-4, 10.  In addition, there is information on record that Plaintiff told Mr. Roessner the reason he threatened Mr. Gettner; and Plaintiff's wife, Mrs. Torres, claims she made Mr. Roessner aware of Plaintiff's history of complaints just prior to Mr. Roessner's decision to terminate Plaintiff.  Docket No. 13-3, 10 and 11 (citing 13-4, 36).  An adverse employment action that follows soon after a plaintiff has engaged in protected activity, may aid in establishing causality.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 657 (8th Cir. 2007); see also Hudson v. Norris, 227 F.3d 1047, 1051 (8th Cir. 2000) (stating that the Eighth Circuit views regarding the value of a temporal connection between protected conduct and an adverse employment action "has ranged from being sufficient, by itself, to create an inference of causation . . . to being nothing more than a 'slender reed of evidence . . . that was not enough to support an inference of causation'") (citations omitted).  Furthermore, the Defendants failed to question Ms. Garcia about the incident between her and Mr. Gettner; and no formal disciplinary action was taken against Mr. Gettner for his alleged actions in relation to Ms. Garcia.  Docket No. 15-

4, 15.  Finally, there is evidence on record indicating that
when dealing with a situation in which a non-Hispanic employee
threatened to kick another employee's ass, Defendants did not
resort to terminating the non-Hispanic employee who made the
threat.[4]  Docket No. 15-4, 19.  Given Defendant's allegedly
repeated failure to take formal disciplinary action against
those who allegedly discriminated against Plaintiff, the
temporal proximity between Plaintiff's protected conduct and
his termination, and Defendants' history of dealing with
similar threats, a reasonable jury could infer that there was
a sufficient causal connection between Plaintiff's protected
conduct and his termination.

---

[4] Defendant refers to this as a "non-threatening threat"
because the employee who was threatened blew it off and
"'really didn't worry about it . . . .'" Docket No. 15-1, 8
(citing Docket No. 10-3, 94-95).

As discussed in the next section of this Memorandum and
Opinion Order, this Court does not think this situation was
sufficient to create a jury question as to whether Defendant's
purported reason for terminating Plaintiff was a mere pre-
text; however, the standard for establishing a causal
connection between protected conduct and an adverse employment
action is less demanding, and so it does constitute evidence
of causality.

**B. Whether Defendant had a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff?**

As previously noted, after a Plaintiff establishes a a prima facie case under the <u>McDonnell Douglas</u> burden shifting framework, a Defendant may counter by presenting evidence of "a legitimate, nondiscriminatory reason for its decision." <u>Guimaraes</u>, 674 F.3d at 973. It then becomes the plaintiff's burden to show that a defendant's purported reason for his decision is a mere pretext for retaliation. <u>Id.</u>

Defendant contends Plaintiff's retaliation claims[5] fail because Defendant had a legitimate, nondiscriminatory reason for terminating Plaintiff, i.e., he threatened Mr. Gettner (Docket No. 10-1, 7-11). Plaintiff contends that because he was treated differently than other similarly situated employees, there is sufficient evidence for a reasonable jury to conclude that Defendant's purported reason for terminating him was a mere pretext. Docket No. 13-3, 6.

A showing of pretext must establish both that a defendant's purported "reason was false, *and* that

---

[5] Again, Plaintiff makes claims under both ICRA and Title VII.

discrimination was the real reason" for the decision. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 515-16 (1993). However, a strong showing that a defendant's purported reason for terminating a plaintiff was false may suffice to show that discrimination was the real reason and vice versa. In <u>Torgersen v. City of Rochester</u>, the Eighth Circuit recently clarified the means whereby a plaintiff can establish pretext:

> There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext . . . A plaintiff may show that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact . . .' Alternatively, a plaintiff may show pretext 'by persuading the court that a [prohibited] reason more likely motivated the employer . . .' Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action.

643 F.3d 1031, 1047 (8th Cir. 2011) (citing and quoting <u>Wallace v. DTG Operations, Inc.</u>, 442 F.3d 1112, 1120 (8th Cir. 2006)).

One of "the most commonly employed method[s] of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons," who are not members of Plaintiff's protected class, "received more favorable treatment." <u>Erickson v. Farmland Indus., Inc.</u>, 271 F.3d 718,

726-27 (8th Cir. 2001). The test for determining "whether employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." <u>EEOC v. Kohler Co.</u>, 335 F.3d 766, 775 (8th Cir. 2003) (quoting <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 972 (8th Cir. 1994)). "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." <u>Id.</u> at 776.

Though Plaintiff refers to three incidents in which he feels similarly situated persons, who were not members of his protected class, were given more favorable treatment, this Court is persuaded only one of these incidents meets the rigorous standard necessary to warrant a comparison. This is the incident in which Mr. Gettner allegedly pushed the box into Plaintiff's mother's stomach, which precipitated Plaintiff's threat. Plaintiff clearly alleges that Mr. Gettner assaulted his mother, which, though not the same conduct, could arguably be characterized as more egregious than the threat Plaintiff made to Mr. Gettner later in the day. Furthermore, the situation was dealt with by the same

19

supervisors, but Mr. Gettner was never formally disciplined. Therefore, based on Defendant's treatment of the incident as a whole, this Court is persuaded that a reasonable jury could conclude that Defendant's reason for terminating Plaintiff was more than likely based on prohibited considerations.

## V.  HOSTILE WORK ENVIRONMENT CLAIMS

As previously noted, Plaintiff makes hostile work environment claims under both Title VII and ICRA based on both racial and sexual harassment.  In Gipson v. KAS Snacktime Co., the Eighth Circuit indicated that "the same standards are generally used to evaluate claims of hostile work environment based upon sexual . . . and racial harassment."  171 F.3d 574, 578 (8th Cir. 1999).  The Iowa Supreme Court has also recognized that a hostile work environment claim under ICRA consists of the same elements as a hostile work environment claim under Title VII.  Boyle v. Alum-Line, Inc., 710 N.W.2d 741, 748 (Iowa 2006).  Thus, the same general standard applies to Plaintiff's Title VII and ICRA hostile work environment claims based on both racial and sexual discrimination.

In order to establish a hostile work environment claim, a plaintiff must prove the following:  "(1) [he] belonged to

a protected group; (2) [he] was subjected to unwelcome harassment; (3) the harassment was based on" his status as a protected class member; "and (4) the harassment affected a term, condition, or privilege of [his] employment." <u>Ogden v. Wax Works, Inc.</u>, 214 F.3d 999, 1006 (8th Cir. 2000).

In relation to Plaintiff's racially hostile work environment claims, Defendant makes the following arguments: (1) a majority of Plaintiff's complaints related to Evelyn DeVos are time-barred; (2) Plaintiff's complaints are not sufficiently severe or pervasive to affect a term, condition, or privilege of his employment; and (3) Plaintiff's unreported complaints cannot support a claim for hostile work environment. In relation to Plaintiff's sexually hostile work environment claims, Defendant makes the following arguments: (1) Plaintiff admits that Defendant properly handled his sexual harassment complaint, and that the harassment stopped; (2) isolated incidents do not rise to the level of a sexual harassment claim; (3) Plaintiff failed to report certain comments; (4) Plaintiff participated in the sexual banter at work; and (5) the comments made were not so severe as to affect a term or condition of Plaintiff's employment. Each of

these arguments will be considered successively throughout the remainder of this Memorandum and Opinion Order.

**A. Whether Plaintiff's Racial Complaints are Time-Barred**

42 U.S.C. § 2000e-5(e) provides that a charge under Title VII must "be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ."[6] However, hostile work environment claims "do not take place in a single day; rather they unfold over a period of time . . . ." Inglis v. Buena Vista University, 235 F. Supp. 2d 1009, 1023 (N.D. Iowa 2002) (citing National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)).

"A plaintiff making a claim of discrimination may challenge incidents which happened outside the statutory time limitations of Title VII if the various incidents or acts of discrimination constitute a continuing pattern of discrimination." Jenkins v. Wal-Mart Stores, Inc., 910 F.

---

[6] The charge may be filed within three hundred days after the unlawful employment practice occurred if the person aggrieved filed "with a state or local agency with authority to grant or seek relief . . . or institute criminal proceedings" for the practice in question, "or within thirty days after receiving notice that the State or local agency has terminated the proceedings . . . . whichever is earlier . . . ." 42 U.S.C. 2000e-5(e).

Supp. 1399, 1413 (N.D. Iowa 1995) (citing <u>Delaware State</u> <u>College v. Ricks</u>, 449 U.S. 250, 258 (1980)) (other citations omitted). Since Plaintiff alleges he was called a "dumb Mexican" and was told that Mexican's have a small penis on a nearly daily basis, Plaintiff has successfully alleged a continuing pattern of discrimination. Furthermore, Plaintiff filed a formal complaint against Ms. DeVos in April of 2009, well within the statutory period. Finally, Plaintiff alleges a hostile work <u>environment</u> claim, and this Court should not and will not determine whether the actions of individual employees fall outside the statutory period so long as Plaintiff alleges a continuing patter of discrimination in the Company as a whole. Therefore, Defendant's argument that Plaintiff's complaint is time-barred lacks merit.

**B.     Whether Plaintiff's Allegations of Racial Discrimination are Sufficiently Severe or Pervasive to Affect a Term, Condition, or Privilege of His Employment**

The Defendant cites case law for the proposition that Evelyn DeVos' alleged statements that English should be mandatory in the work place, her alleged micro management of Plaintiff's work, and her alleged statements that Plaintiff

was an "asshole" and should be told to "fuck off," are, each standing alone, insufficient to show it affected a term, condition, or privilege of his employment.  Docket No. 15-1, 15-16.  However, these allegations of misconduct against Ms. DeVos were only part of an allegedly larger pattern of behavior throughout the Company.  In addition, Defendant fails to note that Plaintiff alleges that Ms. DeVos regularly called Plaintiff a "dumb Mexican" and often said other things behind his back.   Finally, Defendant completely ignores that Plaintiff has leveled allegations not just against Ms. DeVos but against other co-workers.  Again, the question is whether there was a hostile work <u>environment</u>, not whether each and every co-worker's actions, when considered in a vacuum, is actionable.

Though neither party cites any applicable case law, "[p]roving an actionable harm" involves "a high threshold" in a hostile-work-environment claim.  <u>Duncan v. County of Dakota, Neb.</u>, 687 F.3d 955, 959 (8th Cir. 2012).  Some of the factors a court considers include "the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the

job." Wright v. Rolette County, 417 F.3d 879, 885 (8th Cir. 2005) (citing Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004)). A court must consider "the totality of the circumstances to determine if the environment was sufficiently hostile." Duncan, 687 F.3d at 959-60 (citing Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006)).

Plaintiff alleges he was subjected to a daily barrage of inappropriate racial comments. He also alleges that his co-workers' conduct, specifically that of Ms. DeVos, directly related to and undermined his work performance. Therefore, in this Court's judgment, Plaintiff's allegations are sufficient to establish that his co-workers' treatment affected a term, condition, or privilege of his employment.

**C. Whether Plaintiff's Failure to Report His Co-workers' Alleged Racial Discrimination Supports Summary Judgment**

As previously noted, Plaintiff alleges he made numerous complaints from 2007 up through his termination in late 2009. Therefore, Defendants argument lacks merit.

**D. Whether Defendant's Argument that It Properly Handled Plaintiff's Sexual Harassment Complaints is Sufficient to Support Summary Judgment**

The Defendant cites a single answer from Plaintiff's deposition indicating that he felt Defendant properly handled the complaint he lodged against one of his co-workers who was spreading rumors about a romantic affair between himself and a female co-worker. However, Plaintiff alleges that the comments related to the penis size of Mexicans went on from 2007 up to his termination in 2009. Plaintiff also alleges he and his wife, Mrs. Torres, lodged several complaints in relation thereto. Therefore, the Defendant's argument lacks merit.

**E. Whether Plaintiff Alleges Isolated Incidents Not Amounting to a Sexually Hostile Work Environment**

Again, Plaintiff alleges that his co-workers made comments about the size of Mexican penises on nearly a daily basis up until his termination. This does not constitute, by any stretch of the imagination, an isolated incident. Plaintiff also alleges that he received unwelcome sexual advances from a co-worker, and, when he turned those advances

down, his spurned co-worker then spread rumors about a romantic affair between him and another female co-worker. While the unwanted sexual advances and the subsequent rumors occurred on a single occasion, this does not make them isolated incidents; they must be viewed in conjunction with the day-to-day sexual harassment Plaintiff alleges he faced, and, are, therefore, not isolated. Overall, Defendant ignores Plaintiffs allegation of nearly daily sexual harassment; and, for this reason, its argument lacks merit.

**F.    Whether Plaintiff's Purported Failure to Report Certain Incidents of Harassment to his Supervisors Supports Summary Judgment**

Though it is not always clear what Plaintiff's complaints to his supervisors consisted of or when precisely they were made, it is clear that he alleges that he made several complaints beginning in 2007 up through 2009.  It is also clear that some of these complaints related to "sexual comments and sexually graphic behavior directed toward him in the workplace."  Docket No. 15-4, 13.  Therefore, the Defendant's argument lacks merit.

**G.  Whether Plaintiff's Participation in the Sexually Explicit Banter at Work Supports Summary Judgment**

It is undisputed that Plaintiff made a silicone penis that he knew a co-worker intended to place in a female co-worker's locker.  It is also clear that once the female worker complained, Plaintiff told her that if she couldn't handle a joke, she should not be joking in the first place.  However, a plaintiff's failure to grasp the hypocrisy of some of his actions is not generally grounds for summary judgment.  Furthermore, unlike the allegedly repeated comments about the size of Mexican penises, this was an isolated incident; and Plaintiff's overall testimony reflects that, though he attempted to initially participate in and laugh off the jokes directed at him, he, at some point, felt they began to cross a line.

**H.  Whether Comments Made Regarding Plaintiff's Sexuality were Sufficient to Affect a Term, Condition, or Privilege of His Employment**

The Defendant does not make a clear argument related to whether the comments made regarding Plaintiff's sexuality were sufficient to affect a term, condition, or privilege of his

employment.  Rather, the Defendant merely concludes, without citing any case law, that "none of the conduct was so severe or pervasive as to affect a term or condition of employment (as judged by [Plaintiff's] complicity and failure to report) . . . ."  Docket No. 15-1, 19 and 20.  As previously noted, Plaintiff does allege that he made several complaints regarding improper sexual conduct.  Furthermore, the single incident in which Plaintiff made a penis out of silicone does not mitigate the allegedly repeated comments relating to the size of Mexican penises.  Though this Court thinks this case is more appropriately understood as a racial, rather than sexual, harassment case, the movant bears the initial burden "of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of genuine issue."  <u>Hartnagel</u>, 953 F.2d at 395.  Defendant has not done so; and, therefore, Defendant's Motion for Summary Judgment against Plaintiff's sexually hostile-work-environment claims are hereby denied.

## VI.   CONCLUSION

**Defendant's Motion for Summary Judgment is hereby denied as to all of Plaintiff's claims.**

**IT IS SO ORDERED** this 1st day of October, 2012.

_Donald E. O'Brien_
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa